IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

REBECCA SUE CARPENTER,        )
      Plaintiff,             )
                          )
         v.                 )      Civil No. 3:17cv248 (REP)
                          )
NANCY A. BERRYHILL,           )
Acting Commissioner of Social Security,  )
      Defendant.           )
_____)

REPORT AND RECOMMENDATION

On April 30, 2013, Rebecca Sue Carpenter ("Plaintiff") applied for Social Security Disability Benefits ("DIB") and for Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability from Crohn's disease, nerve damage and migraines, with an alleged onset date of November 30, 2012. The Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in: (1) failing to give appropriate weight to the opinion of her treating physician; (2) failing to account for Plaintiff's moderate limitations in concentration, persistence or pace; (3) failing to fully develop the administrative record; and, (4) improperly discounting Plaintiff's credibility. (Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 11) at 16-30.) This matter now comes before the Court for a Report and Recommendation pursuant

to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[1] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

I.    PROCEDURAL HISTORY

On April 30, 2013, Plaintiff filed applications for DIB and SSI with an alleged onset date of November 30, 2012. (R. at 114-15, 218-23.) The SSA denied these claims initially on October 23, 2013, and again upon reconsideration on March 26, 2014. (R. at 18, 118-20, 133-35.) At Plaintiff's written request, the ALJ held a hearing on November 20, 2015. (R. at 18, 34, 171.) On December 21, 2015, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because Plaintiff could adjust to other work existing in significant numbers in the national economy. (R. at 18-28.) On January 23, 2017, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-4.)

II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

---

[1]    The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

2

337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a

preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as

adequate to support a conclusion.  *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig

v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Indeed, "the substantial evidence standard

'presupposes . . . a zone of choice within which the decision makers can go either way, without

interference by the courts.  An administrative decision is not subject to reversal merely because

substantial evidence would have supported an opposite decision.'"  *Dunn v. Colvin*, 607 F.

App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir.

1988)).  To determine whether substantial evidence exists, the court must examine the record as

a whole, but may not "undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ]."  *Hancock*, 667 F.3d at 472

(quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  In considering the decision of

the Commissioner based on the record as a whole, the court must "take into account whatever in

the record fairly detracts from its weight."  *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th

Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The

Commissioner's findings as to any fact, if substantial evidence in the record supports the

findings, bind the reviewing court to affirm regardless of whether the court disagrees with such

findings.  *Hancock*, 667 F.3d at 477.  If substantial evidence in the record does not support the

ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision.

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the

agency employs to determine whether disability exists.  20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential

evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.    THE ALJ'S DECISION

On November 20, 2015, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 34-73.) On December 21, 2015, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 18-28.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 19-28.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 30, 2012. (R. at 20.) At step two, the ALJ found that Plaintiff had the following medically determinable severe impairments: Crohn's disease; irritable bowel syndrome ("IBS"); migraines; chronic pain syndrome; cervical radiculopathy; depression; and, anxiety. (R. at 20.) At step three, the ALJ found that Plaintiff

4

did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 21-22.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work with the following exertional limitations:  Plaintiff could lift, carry, push and pull twenty pounds occasionally and ten pounds frequently, stand/walk for six hours in an eight-hour workday, sit for six hours or more, and frequently climb ramps, stairs, ladders, ropes and scaffolds.  (R. at 22.) The ALJ precluded Plaintiff from workplace hazards such as unprotected heights or moving machinery, but Plaintiff could tolerate moderate noise and occasionally work with the public, coworkers and supervisors.  (R. at 22.)  Plaintiff could perform jobs that she could safely discontinue on an emergent basis to use a restroom.  (R. at 22.)  Finally, the ALJ limited Plaintiff to simple, routine work-related instructions and the ability to concentrate for two hours before requiring a break.  (R. at 22.)  At step four, the ALJ found that Plaintiff could not perform any previous relevant work.  (R. at 26.)  At step five, the ALJ determined that Plaintiff could perform other jobs existing in significant numbers in the national economy.  (R. at 27-28.)  Therefore, Plaintiff did not qualify as disabled under the Act.  (R. at 28.)

## IV.   ANALYSIS

Plaintiff, forty years old at the time of this Report and Recommendation, previously worked as a bus driver and cashier.  (R. at 26, 44, 57, 238.)  She applied for Social Security Benefits, alleging disability from inflammatory bowel disease, Crohn's disease, and migraines, with an alleged onset date of November 30, 2012.  (R. at 74, 114.)  First, Plaintiff's appeal to this Court argues that the ALJ erred by discounting the opinion of Plaintiff's treating physician, John Clay, M.D., without adequate reason.  (Pl.'s Mem. at 19-24.)  Second, Plaintiff alleges that the ALJ erred by failing to adequately incorporate her moderate limitations in concentration,

persistence, and pace into the RFC. (Pl.'s Mem. at 19-21.)   Third, Plaintiff alleges that the ALJ

failed to fairly develop the administrative record. (Pl.'s Mem. at 25-27.)  Finally, Plaintiff

alleges that the ALJ erred in assessing her credibility. (Pl.'s Mem. at 27-30.)  For the reasons set

forth below, the ALJ did not err in his decision.

### A.       The ALJ Did Not Err in Formulating the RFC.

### 1.  The ALJ appropriately weighed Dr. Clay's medical opinion.

Plaintiff argues that the ALJ erred in discounting the medical opinion of her treating

physician, Dr. Clay.  Plaintiff argues that the ALJ failed to adequately explain why he discounted

Dr. Clay's opinion and did not credit Dr. Clay's role as Plaintiff's primary care physician.  (Pl.'s

Mem. at 21-24.) Defendant counters that the ALJ properly weighed Dr. Clay's opinion, because

it contained little narrative explanation, and because the record does not support Plaintiff's claim

that Dr. Clay acted as the nexus of her treatment.  (Def.'s Mot. for Summ. J. and Br. in Supp.

Thereof ("Def.'s Mem.") (ECF No. 12) at 23-24.)  Further, Defendant argues that the ALJ

sufficiently explained the weight that he gave to Dr. Clay's opinion.  (Def.'s Mem. at 25-26.)

During the sequential analysis, when the ALJ determines whether the claimant has a

medically-determinable severe impairment, or combination of impairments, that would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluations that have been ordered.

20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927.  When the record contains a number of

different medical opinions, including those from Plaintiff's treating sources, consultative

examiners or other sources that are consistent with each other, then the ALJ makes a

determination based on that evidence.   §§ 404.1527(c), 416.927(c).  If, however, the medical

opinions prove inconsistent with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-03p.[2] Licensed physicians and licensed or certified psychologists constitute acceptable medical sources. §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a). The ALJ may also consider evidence from "other sources" — including nurse-practitioners, therapists and social workers — as evidence of the severity of impairment or for the effect that the impairments have on the claimant's ability to work. §§ 404.1513(d), 416.913(d).[3] Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. §§ 404.1527(c)(2), 416.927(c)(2); *Lewis v. Berryhill*, 858 F.3d 858,867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p. Notably, the ALJ does not have to accept an opinion from a treating source that opines on the claimant's ultimate disability for employment purposes,

---

[2]     Effective March 27, 2017, the SSA rescinded SSR 06-03p, instead incorporating some of the Ruling's policies into 20 C.F.R. §§ 404.1527(f), 416.927(f). 82 Fed. Reg. 5844-01, at 5844–45, 5854–55 (Jan. 18, 2017). Plaintiff filed her claims on April 30, 2013, before this regulation took effect. (R. at 114-15, 218-23.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

[3]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1513(a) and 416.913(a). The given examples are a non-exhaustive list.

or when the treating source's opinion is inconsistent with other evidence or is not well-supported.  §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

Unless the ALJ "dredged up 'specious inconsistencies,'" courts generally do not interfere with the ALJ's decision. *Dunn*, 607 F. App'x at 267 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1999)).  In other words, the ALJ's assignments of weight stand unless the ALJ failed to offer a sufficient reason for his decision. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion:  (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors.  §§ 404.1527(c), 416.927(c).  However, the regulations specifically vest the ALJ with the authority to determine whether a claimant is disabled as defined under the Act.  §§ 404.1527(d)(1), 416.927(d)(1).

Here, the ALJ dedicated two pages of his decision to summarizing Dr. Clay's treatment history and opinion and those from Plaintiff's other treating providers.  (R. at 23-25.)  Following his analysis of the record, the ALJ afforded Dr. Clay's opinion "partial weight." (R. at 25.)  The ALJ noted that Dr. Clay — as Plaintiff's primary care physician — treated Plaintiff four times in 2013 and 2014.  (R. at 24-25.)  The ALJ explained that he awarded only partial weight, because discrepancies existed between Dr. Clay's opinion and "the clinical findings and opinions" of two of Plaintiff's other treating providers, Elizabeth Bowers, FNP-BC, and Stephen Clement, M.D.  (R. at 25.)

In his opinion dated June 17, 2013, Dr. Clay diagnosed Plaintiff with Crohn's disease and migraines.  (R. at 450-51.)  Dr. Clay deemed Plaintiff's prognosis "fair," and listed her

symptoms as "daily headaches, periodic abdominal pain, [and] frequent loose stools." (R. at 450.) He opined that her symptoms would interfere often with the attention and concentration required to perform simple work-related tasks. (R. at 450.) Dr. Clay did not believe that Plaintiff would need to recline or lie down during an eight-hour workday beyond typical lunch and work breaks. (R. at 450.) He opined that Plaintiff would need to take three to four unscheduled breaks per week, with each break lasting thirty to sixty minutes or potentially requiring her to leave work for the day. (R. at 450.) Dr. Clay assessed that Plaintiff's symptoms would likely cause her to miss work more than four times per month. (R. at 451.) Dr. Clay concluded that Plaintiff remained physically capable of working eight-hour days, five days a week on a sustained basis, but "with accomodations [sic] for breaks" and "intermittent leave of abscences [sic]." (R. at 451.)

Dr. Clay's opinion conflicts with his own treatment records. Dr. Clay treated Plaintiff eight times from 2012 through 2014. (R. at 314-15, 317-18, 321-22, 423-25, 429-30, 450-51, 496-503.) On April 1, 2012, Plaintiff presented to Dr. Clay with "headaches and crohns [sic] disease." (R. at 321.) Plaintiff reported "essentially daily" abdominal cramping that she said felt different from her Crohn's pain. (R. at 321.) Plaintiff told Dr. Clay that her obstetrician-gynecologist felt "that [her] headaches and abdominal cramping are related." (R. at 321.) Dr. Clay assessed Plaintiff's headaches as either a "side effect from Humira" or "rebound headaches from medication overuse." (R. at 322.) Dr. Clay noted Plaintiff's upcoming appointment with her gastroenterologist — Dr. Clement — and a "mild worsening" of her Crohn's symptoms. (R. at 321-22.) Although he noted Plaintiff's history of depression, during this visit Dr. Clay assessed Plaintiff as "[n]egative" for depression. (R. at 321.)

9

On May 10, 2012, Plaintiff returned to Dr. Clay, complaining that her headaches and lower abdominal cramping persisted. (R. at 317-18.) Dr. Clay noted that Plaintiff appeared "sleepy" and "somewhat sedated" but with appropriate mood and affect. (R. at 317-18.) Dr. Clay again determined that either Humira or medication overuse caused Plaintiff's headaches. (R. at 318.) Dr. Clay recommended that Plaintiff "see [a] headache specialist." (R. at 318.)

Dr. Clay examined Plaintiff again on January 16, 2013, after Plaintiff "awoke on the floor" during colonoscopy preparations. (R. at 314.) Plaintiff reported recurring depression, chronic headaches and "abdominal pain chronically with waxing/waning." (R. at 314.) Dr. Clay suspected that Plaintiff had suffered a "vasovagal episode perhaps due to dehydration" or possible abuse. (R. at 314-15.) Plaintiff had taken Celexa for her depression, but stopped taking it "in the past few months." (R. at 314.) Dr. Clay noted that Plaintiff had "significant stress in her home life[,]" and that her depression had returned. (R. at 314.) Dr. Clay recommended that Plaintiff adequately hydrate, and he prescribed Celexa and Remeron for her depression. (R. at 315.) Five months after this appointment, Dr. Clay issued his opinion on Plaintiff's condition. (R. at 450-51.)

Plaintiff next returned to Dr. Clay on October 24, 2013 for a cough and congestion. (R. at 423-25.) During this visit, Dr. Clay noted that Plaintiff had experienced "mild Crohn's flaring recently but overall [was] doing well." (R. at 423.) However, Plaintiff's recent loss of her dog and grandmother caused her stress and sadness. (R. at 423.) On February 21, 2014, Plaintiff presented to Dr. Clay for medication refills, and she complained that she felt "awful" from her depression and anxiety. (R. at 429.) Plaintiff regularly took Mercaptopurine and Humira, but had recently stopped taking all other medications. (R. at 429.) Dr. Clay noted that Plaintiff's

grandmother's recent death exacerbated her depression and anxiety.  (R. at 429.)  Dr. Clay

refilled Plaintiff's depression medication and also added Wellbutrin.  (R. at 430.)

On October 14, 2014, Dr. Clay saw Plaintiff for a follow-up visit after an emergency

room doctor diagnosed her with sinusitis.  (R. at 502, 714-19.)  Plaintiff did not experience

nausea or diarrhea and, at that time, she only took Humira when necessary.  (R. at 502-03.)

Plaintiff still took Wellbutrin, but she did not report any depression symptoms during this visit.

(R. at 502-03.)  When Plaintiff returned for a check-up on October 30, 2014, Dr. Clay assessed

her with headaches and post-traumatic stress disorder ("PTSD").  (R. at 499-500.)  Dr. Clay

referred Plaintiff to a neurologist for her headaches.  (R. at 500.)  He also confirmed that Plaintiff

would follow up with her psychiatrist regarding her PTSD and continue taking her depression

medications.  (R. at 500.)  Plaintiff denied diarrhea or constipation, and only took Humira if

needed.  (R. at 499-500.)  Dr. Clay saw Plaintiff again on November 26, 2014 for an upper

respiratory infection.  (R. at 496-98.)  Plaintiff again denied nausea, vomiting or diarrhea, and

only took Humira if needed.  (R. at 496-97.)  Dr. Clay did not note any additional depression

symptoms during this visit.  (R. at 496-98.)

The ALJ accurately set out Dr. Clay's opinion and treatment records.  Inconsistencies

between the record and Dr. Clay's opinion further support the ALJ's decision to give partial

weight to Dr. Clay's opinion.  Before issuing his June 2013 opinion, Dr. Clay observed in 2012

that Plaintiff's Crohn's symptoms mildly worsened and in 2013 that Plaintiff's abdominal pain

waxed and waned.  (R. at 314, 321-22.)  However, after Dr. Clay's 2013 opinion, his treatment

notes do not mention abdominal pain, Plaintiff denied having diarrhea, and Plaintiff began only

taking Humira as needed.  (R. at 496-97, 499-503.)  Dr. Clay mentioned Plaintiff's Crohn's once

after penning his opinion, noting in October 2013 that Plaintiff experienced "mild Crohn's

flaring recently" but otherwise making unremarkable findings. (R. at 423.) Dr. Clay's later

treatment records do not support his opinion that Plaintiff experienced such pain and frequent

loose stools that she would miss more than four day of work per month. (R. at 451.) Therefore,

Dr. Clay's opinion does not comport with his own treatment records, and the ALJ appropriately

afforded it only partial weight. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) ("[I]f a

physician's opinion is . . . inconsistent with other substantial evidence, it should be accorded

significantly less weight.").

The ALJ also afforded Dr. Clay's opinion less weight due to its inconsistencies with Dr.

Clement's and Nurse Bowers' findings and opinions.[4] (R. at 25.) On May 4, 2012, Plaintiff

presented to Nurse Bowers for a Crohn's check-up. (R. at 369-71.) Nurse Bowers described

Plaintiff's Crohn's as "moderate to severe" but with "completely controlled" symptoms. (R. at

369.) Plaintiff had started taking Humira and responded well. (R. at 371.) During Plaintiff's

next check-up on December 10, 2012, she complained of worsening symptoms, including

cramping, diarrhea and abdominal pain. (R. at 372.) Nurse Bowers reported that Plaintiff began

a Crohn's "flare" three weeks earlier. (R. at 374.) However, Nurse Bowers continued Plaintiff

on the same treatment plan. (R. at 374.)

On February 24, 2014, Nurse Bowers re-checked Plaintiff's Crohn's. (R. at 440-42.)

Records from other providers at Gastrointestinal Specialists in the intervening period showed

that Plaintiff had no complaints. (R. at 379, 436-39.) During Plaintiff's February 2014 visit,

Nurse Bowers assessed Plaintiff as "much improved" and responding well to Humira. (R. at

440, 443.) Nurse Bowers also noted that Plaintiff's grandmother's recent death made Plaintiff

---

[4]     The Court notes that Dr. Clement did not offer a medical opinion, and the ALJ afforded
even less weight to Nurse Bowers' more restrictive opinion than he did Dr. Clay's. (R. at 25.)
Therefore, the Court reviews the medical findings of both Dr. Clement and Nurse Bowers to
determine whether they support the ALJ's weight assessment.

"very depressed," and she received treatment for her depression from her primary care provider. (R. at 443.)

Nurse Bowers' treatment records from March 13 and 21, 2014, stated that Plaintiff had no complaints. (R. at 470-71.) On June 16, 2014, Plaintiff presented similarly. (R. at 466-69.) Again, Nurse Bowers noted that Plaintiff had "completely controlled" Crohn's symptoms such that Nurse Bowers characterized the condition as "in remission." (R. at 466.) Plaintiff took one dose of Humira in June after not taking any since April. (R. at 469.) Nurse Bowers concluded that Plaintiff's medication and "lessening tobacco use" put her Crohn's in remission. (R. at 469.) On October 3, 2014, Nurse Bowers again described Plaintiff's symptoms as "completely controlled." (R. at 462.) Nurse Bowers noted that Plaintiff's chronic Crohn's "has been occurring in a decreasing pattern for years." (R. at 462.) Plaintiff reported no urgency in her bowel movements, and her Crohn's remained "in remission." (R. at 462, 465.) Plaintiff had not taken Humira regularly after April. (R. at 465.)

Because Nurse Bowers' opinion does not qualify as a medical opinion, the ALJ afforded it "little weight." (R. at 25.) The ALJ gave some credence to Nurse Bowers' treatment records, however, because of her history examining and treating Plaintiff. (R. at 25.) Nurse Bowers treated Plaintiff twelve times between 2011 and 2014. (R. at 363-77, 440-45, 448-49, 462-71.) Nurse Bowers' treatment records track a similar improvement in Plaintiff's symptoms as evidenced by Dr. Clay's records from 2013 to 2014. Similarly, Nurse Bowers' treatment records diverge from Dr. Clay's opinion by describing Plaintiff's Crohn's symptoms as completely controlled and in remission on multiple occasions in 2014. (R. at 465, 469.) These notes sharply contrast with Dr. Clay's opinion that Plaintiff's symptoms would require her to take three or four

thirty- to sixty-minute breaks during a workweek and miss work altogether more than four days per month.  (R. at 450-51.)

Dr. Clay's opinion also conflicts with Dr. Clement's treatment records.  On July 8, 2011, Dr. Clement performed a colonoscopy on Plaintiff, because she had recently experienced "increasing episodes of pain" that led to emergency room visits.  (R. at 380.)  Dr. Clement wanted to "check the anastomosis[5] to see if further therapy is warranted."  (R. at 380.)  Dr. Clement found mild to moderate Crohn's activity, and he recommended that Plaintiff continue taking Mercaptopurine and add a biologic, "such as Humira or Remicade."  (R. at 380-81.)

On January 11, 2013, Plaintiff underwent another colonoscopy.  (R. at 382-83.)  Dr. Clement performed this procedure to ensure that no Crohn's activity existed in Plaintiff's colon. (R. at 382.)  Dr. Clement found mild Crohn's at the anastomosis.  (R. at 382.)  Dr. Clement could not determine the origin of Plaintiff's abdominal pain, but he suspected that Plaintiff had "a combination of irritable bowel, chronic pain, and Crohn's baseline."  (R. at 382.)  Shortly after that colonoscopy, Dr. Clement treated Plaintiff on January 14 and 21, 2013.  (R. at 361-62.)  On January 14, Plaintiff had done well taking Humira bi-weekly, but "[a]bout 3 weeks ago she began to flare."  (R. at 361.)  On January 21, Dr. Clement scheduled a routine abdominal ultrasound for Plaintiff three days later.  (R. at 362.)  Plaintiff's abdominal ultrasound yielded normal results.  (R. at 400.)

Plaintiff returned to Dr. Clement on December 4, 2014 with recurrent, daily abdominal and headache pains.  (R. at 458.)  Dr. Clement found Plaintiff to be alert, cooperative and

---

[5]    Anastomosis consists of "an opening created by surgical, traumatic, or pathological means between two normally separate spaces or organs."  *Anastomosis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).  Plaintiff underwent an ileal resection in 2008.  (R. at 380.) Crohn's "most often is found in the terminal ileum." *Crohn Disease*, Dorland's Illustrated Medical Dictionary.

pleasant. (R. at 461.)  Plaintiff's symptoms included abdominal pain, bloody stool, nausea and

vomiting. (R. at 460.)  Dr. Clement noted that "[h]er daily abdominal pain pattern suggests IBS

more than Crohn's." (R. at 461.)  He also noted that Plaintiff recently had normal complete

blood count test results. (R. at 461.)  Dr. Clement planned for Plaintiff to continue taking

Mercaptopurine daily and to undergo another colonoscopy. (R. at 461.)

On December 22, 2014, Dr. Clement performed another colonoscopy. (R. at 456-57.)

Plaintiff's procedure resulted in a "good report." (R. at 456.)  Dr. Clement found that the

"Crohn's seems limited to the anastom[o]sis." (R. at 456.)  Dr. Clement recommended that

Plaintiff continue taking Mercaptopurine, and that she could add Humira. (R. at 456.)

Dr. Clement's records, like Nurse Bowers' records and Dr. Clay's later records, contrast

with Dr. Clay's opinion.  Plaintiff's abdominal and headache pains continued into 2014, but after

multiple colonoscopies, Dr. Clement confirmed that Plaintiff suffered from mild Crohn's only

around the anastomosis. (R. at 382, 456.)  Contrary to Dr. Clay's opinion that Plaintiff's Crohn's

disease caused her "periodic abdominal pain" and "frequent loose stools," Dr. Clement

performed tests that could not pinpoint the etiology of Plaintiff's abdominal pain. (R. at 382,

450.)  According to Dr. Clement, a "combination of irritable bowel, chronic pain, and Crohn's

baseline" caused Plaintiff's pain. (R. at 382.)

Other objective medical evidence in the record further supports the ALJ's decision to

afford Dr. Clay's opinion partial weight.  On March 26, 2013, Plaintiff saw neurologist Mubashir

Khan, M.D., on referral from Dr. Clay. (R. at 318, 402-04.)  Plaintiff presented to Dr. Khan with

chronic pain syndrome, post-traumatic headache, drug induced headache, migraine, joint/arm

pain, an unspecified head injury and other syndromes affecting the cervical region. (R. at 402-

04.)  Plaintiff complained of vomiting, sensitivity to light and sound, and vision distortion. (R. at

403.) Dr. Khan found Plaintiff oriented with recent and remote memory intact and appropriate mood and affect. (R. at 404.) Dr. Khan gave Plaintiff a bilateral greater occipital nerve ("GON") block, started her on Imitrex and Depakote, and counseled her to "avoid [over the counter] analgesics and other pain medications to control" her headaches. (R. at 404.) Dr. Khan saw Plaintiff two days later for a follow-up appointment. (R. at 406-08.) Plaintiff reported that her head felt "much better" since receiving the GON block. (R. at 407.) Plaintiff complained again of left elbow pain, and also reported tingling in her fingers. (R. at 407.) Dr. Khan told Plaintiff that either tendonitis or "a small possibility of ulnar neuropathy" caused her elbow pain. (R. at 408.) Dr. Khan started Plaintiff on Neurontin. (R. at 408.)

On April 4, 2013, Plaintiff returned to Dr. Khan on referral from an emergency room visit. (R. at 409-11.) Plaintiff presented to the emergency room for an "electric shock like feeling and pain" in her upper neck, lower back and arms. (R. at 410.) Plaintiff reported that she had experienced pain for approximately two months that had intensified in recent days. (R. at 410.) Plaintiff told Dr. Khan that the pain woke her up at night, but she had not experienced trouble walking, or any speech or facial difficulties. (R. at 410.) Dr. Khan ordered an MRI. (R. at 411.) On May 7, 2013, Dr. Khan saw Plaintiff to explain the MRI results. (R. at 412-14.) Plaintiff told Dr. Khan that her headaches and other symptoms persisted. (R. at 413.) Dr. Khan advised Plaintiff that "she should go back to work," because her MRI and EMG yielded normal results. (R. at 414.)

On February 19, 2014, Plaintiff returned to Dr. Khan, reporting that her left arm numbness had dissipated, but her other symptoms persisted. (R. at 415-17.) Dr. Khan again reassured Plaintiff that "all her work up including [her] MRI [and] EMG ha[d] been negative." (R. at 417.) Dr. Khan opined that Plaintiff's headaches may have stemmed from taking Humira.

(R. at 417.)  Dr. Khan started Plaintiff on Elavil and Imitrex for her migraines.  (R. at 417.)  Dr. Khan also counseled Plaintiff to quit smoking.  (R. at 417.)

Dr. Khan's treatment of Plaintiff supports Dr. Clay's opinion that Plaintiff suffered daily headaches.  (R. at 402-17, 450.)  However, Dr. Khan repeatedly assured Plaintiff of her clear neurological test results.  (R. at 412-17.)  By contrast, Dr. Clay opined that Plaintiff's symptoms would often interfere with her ability to concentrate on work-related tasks and that Plaintiff could only work with accommodations for "intermittent leave."  (R. at 451.)  The GON block improved Plaintiff's headaches.  (R. at 407.)  Dr. Khan recommended other methods to alleviate Plaintiff's pain, including medication and cessation of smoking.  (R. at 417.)  Dr. Khan's treatment records showed normal neurological test results and gave Plaintiff options to lessen her chronic pain.

In July and August 2015, Plaintiff sought treatment for PTSD at Virginia South Psychiatric and Family Services.  (R. at 483-89.)  On July 30, 2015, the treating physician described Plaintiff as articulate and cooperative, with organized thought process, but also depressed with crying spells.  (R. at 487.)  In her discussion with the doctor, Plaintiff set a long-term goal of overcoming her PTSD.  (R. at 489.)  Plaintiff returned on August 17, 2015, complaining of lack of sleep.  (R. at 484.)  The physician noted that Plaintiff had made improvements toward her goal.  (R. at 484.)  Plaintiff returned again on August 28, 2015, reporting recurrent depression.  (R. at 483.)  Plaintiff's progress towards her goal remained "improving" but "unchanged."  (R. at 483.)  When considered together, this objective medical evidence in the record shows an improving trend in Plaintiff's symptoms that she managed through continued treatment and medication.

Plaintiff's own statements further support the ALJ's decision to award only partial weight to Dr. Clay's opinion. Plaintiff's testimony before the ALJ briefly addressed her abilities and daily activities. (R. at 41-65.) Plaintiff testified that she could comfortably lift about twenty-five pounds, and she could stand comfortably for about thirty minutes when not around a crowd. (R. at 53-54.) She stated that she could walk up to a block without any trouble and sit for about an hour before needing to stand and move around. (R. at 55.)

On good days, Plaintiff testified that she went outside, attended her teenage children's activities, and went with her children to the park. (R. at 59.) On bad days, Plaintiff felt miserable and wanted to lay in bed all day. (R. at 59-60.) Plaintiff claimed that she had about three good days per week, and she described the remaining days as "not really bad, but not good either." (R. at 58, 61.)

In June 2013, Plaintiff completed an adult function report that offered more insight into her daily activities. (R. at 246-53.) Each day, Plaintiff stated that she woke her children for school, ate, took her medications, rested, read, wrote and watched television. (R. at 246.) She cared for her children, cooked frozen meals on her own and complete meals with help from others. (R. at 247-48.) She had no problems maintaining her personal care, except that she had to constantly use the restroom. (R. at 247.)

Plaintiff would take all day to clean her house with the help of someone else and taking breaks throughout the day. (R. at 248.) Plaintiff did not drive, but she rode in cars and used public transportation. (R. at 249.) Once a month, Plaintiff would spend all day shopping for food and household items. (R. at 249.) Plaintiff maintained her own finances. (R. at 249.) Plaintiff attended church weekly, and she socialized by playing cards and talking on the phone.

(R. at 250.)  Plaintiff stated that her symptoms affected her ability to lift, reach, see, use her hands, complete tasks, and climb stairs.  (R. at 251.)

Plaintiff's subjective statements do not entirely comport with Dr. Clay's opinion.  As Dr. Clay opined, Plaintiff claimed that she had to take breaks throughout the day to use the restroom. (R. at 253, 450.)  However, Dr. Clay concluded that Plaintiff's symptoms would often interfere with her ability to pay attention and concentrate on work-related tasks.  (R. at 450.)  By contrast, Plaintiff stated that her symptoms did not inhibit her ability to concentrate, understand or follow instructions.  (R. at 251.)  Instead, Plaintiff indicated that her need to use the bathroom interrupted her activities.  (R. at 41-42, 44-45, 248.)  Additionally, Plaintiff's daily activities themselves contradict Dr. Clay's conclusions.  Plaintiff managed her finances, cared for her children, read, wrote, watched television, spent entire days shopping or cleaning, regularly attended church and socialized.  (R. at 246-53.)

After reviewing Plaintiff's medical records, the ALJ determined that Dr. Clay's opinion deserved only partial weight.  (R. at 25.)  Dr. Clay's own treatment records, objective medical evidence in the record and Plaintiff's admitted daily activities conflict with Dr. Clay's 2013 opinion.  Therefore, substantial evidence supports the ALJ's decision to afford partial weight to that opinion.

## 2. The ALJ adequately accounted for Plaintiff's moderate difficulties with concentration, persistence or pace.

Plaintiff also argues that the ALJ erred by failing to explain how she could comprehend and complete "simple" work activities in two-hour increments despite her moderate limitations in concentration, persistence and pace.  (Pl.'s Mem. at 19.)  Plaintiff argues that the Court should remand the ALJ's decision under *Mascio*, because the ALJ did not sufficiently explain Plaintiff's concentration, persistence or pace limitations.  (Pl.'s Mem. at 19.)  Defendant responds that the

19

ALJ adequately account for Plaintiff's moderate limitations and sufficiently incorporated his findings into Plaintiff's RFC.  (Def.'s Mem. at 16-22.)

After step three of the sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1), 416.920(e)-(f), 416.945(a)(1).  In analyzing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental limitations and then determine the claimant's RFC for work activity on a regular and continuing basis.  §§ 404.1545(b), 416.945(b).  Generally, the claimant bears the responsibility to provide the evidence that the ALJ utilizes in making his RFC determination; however, before making a determination that a claimant does not have a disability, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. §§ 404.1545(a)(3), 416.945(a)(3).  The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that find a basis in the claimant's credible complaints.  §§ 404.1545(e), 416.945(e); SSR 96-8p.

Under *Mascio*, if the ALJ finds at step three that the claimant has moderate difficulties in maintaining her concentration, persistence or pace, the ALJ must address these difficulties when assessing Plaintiff's RFC.  *Mascio*, 780 F.3d at 638.  Therefore, post-*Mascio*, reviewing courts must ensure that ALJs appropriately accounted for moderate difficulties when determining RFCs.  *See Kearson v. Colvin*, 2016 WL 4318968, at *5-6 (E.D. Va. Aug. 12, 2016) (finding that the RFC inadequately accounted for the plaintiff's moderate difficulties); *see also Handy v. Comm'r*, 2015 WL 9302972, at *3 n.4 (D. Md. Dec. 22, 2015) (explaining the distinction between moderate limitations and mild or no limitations).  However, the Fourth Circuit did not hold that a finding of moderate limitations in concentration, persistence or pace automatically

translates to a limitation in the RFC. *Mascio*, 780 F.3d at 638. Instead, the ALJ may exclude

those mental limitations if he explains why they do not affect the claimant's ability to work. *Id.*

Without this explanation, the Court must remand the case to the Agency. *Id.*

Here, the ALJ's explanation and corresponding restrictions in the RFC fit squarely into

the parameters of *Mascio*. In *Mascio*, the exclusion of limitations from the RFC to account for

the claimant's moderate difficulties in concentration, persistence or pace warranted remand,

because the ALJ failed to explain his decision. 780 F.3d at 637-38. However, "it would have

been appropriate to exclude" the mental limitations if the ALJ found that "the concentration,

persistence, or pace limitation [did] not affect Mascio's ability to work." *Id.* at 638. Here, the

ALJ incorporated certain mental limitations into the RFC and explained his reasoning. (R. at

22.) In the RFC, the ALJ found that Plaintiff could "understand, remember and carry out simple

and routine work related instructions, and concentrate for periods of two hours on work related

tasks before requiring a break." (R. at 22.) The ALJ further found that Plaintiff could

"occasionally work with the public, coworkers and supervisors." (R. at 22.) Finally, the ALJ

restricted Plaintiff to jobs that could "be discontinued safely on an emergent basis should

[Plaintiff] require the use of a restroom." (R. at 22.) The ALJ went well beyond merely limiting

Plaintiff to "'simple' work completed in 2-hour blocks" as Plaintiff suggests. (Pl.'s Mem. at 19.)

Explaining his decision, the ALJ noted that Plaintiff engaged in activities of daily living

that required some level of concentration, including caring for her children, preparing meals,

using public transportation and managing her own finances. (R. at 21-22.) According to the

ALJ, the record did not reflect an inability to focus on Plaintiff's part. (R. at 22.) Moreover, the

ALJ noted one of Plaintiff's treatment records that described her as oriented with intact memory

21

as well as appropriate mood and affect.  (R. at 22.)  The ALJ also observed that Plaintiff could perform some household chores, visit with others and go to church.  (R. at 26.)

Substantial evidence in the record supports the ALJ's determination.  As stated above, Plaintiff admitted in her function report that she cared for her children, prepared meals, used public transportation, handled money, cleaned, shopped, read, played cards and went to church.  (R. at 246-50.)  The ALJ noted that these activities require some level of concentration.  (R. at 21.)  Indeed, Plaintiff stated that when she shopped or cleaned, she spent the entire day doing so.  (R. at 248-49.)  On many occasions, her treatment providers noted that Plaintiff appeared alert, cooperative, pleasant and oriented times three.  (R. at 364, 367, 370, 373, 404, 407, 411, 414, 417, 424, 430, 503, 539, 556, 616-17, 630.)  During one appointment, a nurse practitioner described Plaintiff as fatigued with a flat affect.  (R. at 427.)  However, Plaintiff had influenza during that appointment.  (R. at 426-27.)  Her neurological treatment records provide additional support that Plaintiff did not suffer from more severe limitations in concentration, persistence or pace.  Specifically, treatment providers routinely noted that Plaintiff had no confusion, memory loss or speech disorder.  (R. at 403, 407, 410, 413, 416.)

Additionally, the ALJ recognized that — according to Dr. Clay — Plaintiff's symptoms would disrupt her ability to concentrate on work-related tasks.  (R. at 24.)  However, the ALJ highlighted that by 2014 — after Dr. Clay's opinion — both Dr. Clement and Nurse Bowers described Plaintiff's Crohn's disease as in remission.  (R. at 25.)  Indeed, in October 2014, Nurse Bowers implored Plaintiff "to completely abstain from smoking," explaining that doing so would keep her Crohn's in remission.  (R. at 465.)  Unfortunately, as the ALJ noted, Plaintiff failed to comply with that medical advice and resumed smoking, thereby exacerbating her symptoms.  (R. at 26, 465, 496, 499, 616, 729.)

Grounded in objective medical evidence from the record and Plaintiff's admitted daily activities, the ALJ adequately accounted for Plaintiff's moderate limitations in concentration, persistence or pace in the RFC and sufficiently explained his determination.  Plaintiff points to no evidence in the record — beyond the work-preclusive medical opinions which the ALJ appropriately discounted — to suggest that Plaintiff's mental limitations required a more restrictive RFC.  Instead, Plaintiff argues that the ALJ failed to explain his decision.  (Pl.'s Mem. at 15-17.)  Because the ALJ offered sufficient explanation and substantial evidence supports the RFC findings, the ALJ did not err.

### 3.  The ALJ adequately developed the record.

Next, Plaintiff argues that the ALJ erred by failing to fully develop the administrative record.  (Pl.'s Mem. at 23-25.)  Plaintiff alleges that the ALJ gave "no appreciable weight to" any of the medical opinion evidence, and that therefore the ALJ formulated the RFC based on "raw medical data." (Pl.'s Mem. at 24.)  According to Plaintiff, the ALJ should have ordered a consultative examination of Plaintiff to adequately develop the record.  (Pl.'s Mem. at 24.)  Defendant responds that the ALJ did not need to further develop the record, because he did not reject all of the medical opinion evidence as Plaintiff suggests.  (Def.'s Mem. at 26-28.)  Defendant argues that the record presents no unresolved conflict to warrant a consultative examination.  (Def.'s Mem. at 27-28.)

Plaintiff bears the burden of proving her disability.  *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981) (citations omitted).  The ALJ, however, "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (citations omitted).  The ALJ retains the

responsibility to develop the record in all proceedings. *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). When a claimant appears *pro se* before the ALJ, "the ALJ ha[s] a heightened duty of care to adequately develop the record." *Craig*, 76 F.3d at 591; *see also Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980) (ALJs "have a duty to assume a more active role in helping claimants develop the record."). When the claimant appears at the hearing with counsel, however, the ALJ may assume that the claimant "is making h[er] strongest case for benefits." *Stuckey v. Colvin*, 2016 WL 403651, at *11 (E.D. Va. Jan. 11, 2016) (quoting *Nicholson v. Astrue*, 341 F. App'x 248, 253 (7th Cir. 2009) (citation omitted)).

The regulations afford the ALJ discretion to determine whether to order a consultative examination. 20 C.F.R. §§ 404.1519a, 416.919a; *Bishop v. Barnhart*, 78 F. App'x 265, 268 (4th Cir. 2003). An ALJ may order a consultative examination if he cannot obtain needed information from a claimant's medical sources. §§ 404.1519a(a), 416.919a(a). For example, an ALJ might require a consultative examination when treating sources refuse to cooperate and provide evidence, when highly specialized medical evidence bears on the decision or when the record indicates a relevant change in the claimant's condition that the existing evidence does not address. §§ 404.1519a(b), 416.919a(b).

Here, the ALJ reviewed the extensive record, chronicled Plaintiff's relevant medical history and considered Plaintiff's own account of her symptoms and their effects on her abilities. (R. at 22-26.) Contrary to Plaintiff's narrative, the ALJ awarded appreciable weight to medical opinions in the record. The ALJ afforded partial weight to Dr. Clay's opinion (excluding the amount of time that Plaintiff's impairments would cause her to miss work) and partial weight to the state agency medical opinions (excluding their "paragraph B" findings). (R. at 25.) In the RFC, the ALJ incorporated the weight restrictions opined by Dr. Clay as well as Plaintiff's

emergent need to use the restroom and take breaks.  (R. at 22, 450-51.)  From the state agency medical opinions, the ALJ adopted the sitting, standing and walking restrictions, as well as postural and environmental limitations into the RFC.  (R. at 22, 79-80, 85-89, 100-01, 110-11.)  The ALJ gave little weight to Nurse Bowers' opinion, finding her treatment notes more reflective of Plaintiff's condition and capabilities.  (R. at 25.)

The record includes extensive treatment records and opinions from two treating sources as well as the state agency medical consultants.  As Defendant correctly notes, the record did not lack sufficient information, contain such inconsistencies or suggest an unestablished change in Plaintiff's condition that might warrant a consultative examination.  (Def.'s Mem. at 27); 20 C.F.R. §§ 404.1519a, 416.919a.  Instead, after considering the entire record before him, the ALJ appropriately weighed the medical opinions and fashioned the RFC based on the evidence of record.  (R. at 18, 20-26.)  Substantial evidence supports the ALJ's decision, and he did not err by failing to order a consultative examination.

### B.       The ALJ Properly Assessed Plaintiff's Credibility.

Finally, Plaintiff argues that the ALJ erred in finding her only partially credible.  (Pl.'s Mem. at 27-28.)  According to Plaintiff, the ALJ did not adequately explain his credibility assessment and improperly relied on his own observations of Plaintiff.  (Pl.'s Mem. at 27-29.)  Finally, Plaintiff alleges that the ALJ should have considered her prior work history.  (Pl.'s Mem. at 29.)  Defendant responds that the ALJ adequately explained the credibility determination, and that the record supports the ALJ's decision.  (Def.'s Mem. at 28-31.)

The ALJ must evaluate a claimant's RFC after step three of the sequential analysis, but before deciding whether a claimant can perform past relevant work at step four.  20 C.F.R.

§§ 404.1520(e)-(f), 404.1545(a)(1).  In determining Plaintiff's RFC, the ALJ must consider all presented evidence when evaluating a claimant's symptoms, including "information about [the claimant's] past work record."   § 404.1529(c)(3).  In addition to considering past work, the ALJ considers a variety of other information including statements about the claimant's symptoms, evidence submitted by the claimant's medical sources and evidence submitted by SSA employees and others.  § 404.1529(c)(3).  The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p, at 5-6, 11.[6]

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997).  The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)).  When the ALJ appropriately considers all relevant factors, hears the claimant's testimony and observes his demeanor, the ALJ's credibility determination deserves such deference. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).  Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

---

[6]     On March 16, 2016, the Agency issued SSR 16-3p, which rescinded and superseded SSR 96-7p, eliminating the credibility finding at issue here.  Plaintiff filed her claims on April 30, 2013, before SSR 16-3p took effect.  (R. at 114-15, 218-23.)  As previously stated, the Agency does not have the power to engage in retroactive rulemaking.  Thus, the Court will review the ALJ's decision under SSR 96-7p.

The ALJ determined that Plaintiff's medically determinable impairments could reasonably cause her alleged symptoms. (R. at 26.) After detailing Plaintiff's relevant medical history, the ALJ concluded that her impairments "limited her ability to engage in work activities," but he found Plaintiff "only partially credible as to the extent of her limitations." (R. at 26.) The ALJ explained that Plaintiff continued to engage in daily activities that contradicted her alleged constant pain. (R. at 26.) Plaintiff's treating medical providers' notes similarly did not comport with the degree of limitation that Plaintiff alleged. (R. at 26.) The ALJ found that Plaintiff's medical records reflected that she responded well to medication, and he saw "no evidence that her impairments cannot be controlled." (R. at 26.) The ALJ also considered Plaintiff's noncompliance with repeated admonitions from her treating providers to stop smoking. (R. at 26.)

Substantial evidence in the record supports the ALJ's credibility assessment. Plaintiff's own statements regarding her daily activities contradict the extreme limitations that she alleged. For example, Plaintiff testified that her Crohn's flares would last for three or four days at a time and require her to use the restroom five or six times in a four-hour period. (R. at 41-42, 45-46.) When she worked, Plaintiff recalled "a couple of times" when she soiled herself and had to leave. (R. at 57.) She stated that her Crohn's flares persisted despite the medication that she took. (R. at 45.) Even on good days, Plaintiff testified that she still had urgent needs to use the restroom three or four times per day. (R. at 55-56.) Plaintiff described her everyday pain level as around 7/10. (R. at 47.) She acknowledged experiencing relief from her medications, but claimed that they quickly wore off. (R. at 48, 50-52.) On good days, she spent time outside and with her children. (R. at 59.) On bad days, she only wanted to stay in bed and "not really do anything." (R. at 59-60.) Plaintiff acknowledged that she no longer had daily headaches, as she

had learned to manage them with medication. (R. at 50-51.) Medication also relieved Plaintiff's depression, though it did not entirely eliminate the condition. (R. at 51-52.)

By contrast, in her function report Plaintiff indicated that she routinely cared for her two children, managed her own finances, used public transportation, regularly went to church, talked on the phone and played cards. (R. at 246-53.) Despite testifying that she could only stand for fifteen to thirty minutes at a time and walk up to a block, Plaintiff also reported that she would take a full day to go shopping or clean the house. (R. at 53-55, 248-49.) She went outside about twice daily, and she read and wrote daily since she stopped working. (R. at 249-50.) While Plaintiff still stated her need to use the restroom and take breaks, these activities undermine Plaintiff's testimony of a more restricted daily life.

The objective medical evidence also supports the ALJ's decision to find Plaintiff partially credible. Again, the record reflects that Plaintiff's symptoms — particularly her headaches and Crohn's — had improved beginning in 2014. (R. at 440-43, 456, 462, 465-66, 469-71, 496-503.) Plaintiff argues that the ALJ improperly dismissed her testimony about her frequent urgency to use the restroom due to her Crohn's. (Pl.'s Mem. at 28.) However, the more recent medical records before the ALJ show her Crohn's symptoms "completely controlled" and "in remission." (R. at 462, 465-66, 469.) In October 2014, when Plaintiff remained complaint with her regimen, she had fewer bowel movements and no urgency associated with them. (R. at 462.) Similarly, Dr. Clement and Dr. Khan each determined that laboratory and ultrasound tests performed in 2013 and 2014 yielded normal results. (R. at 400, 412-14, 417, 461.) These records rebut the debilitating degree of symptoms that Plaintiff alleges.

The ALJ also appropriately considered Plaintiff's noncompliance with medical advice to quit smoking when assessing her credibility. Various treating providers counseled Plaintiff to

stop smoking on at least twelve occasions between 2012 and 2015.  (R. at 312, 369, 371-72, 417, 423, 429, 465, 469, 478-80, 598-603, 618-19, 729.)  Though she quit for a time in 2014, treatment providers frequently noted that Plaintiff smoked daily — as recently as October 19, 2015.  (R. at 372, 423, 429, 465, 469, 474-78, 729.)  On multiple occasions when Nurse Bowers noted improvement in Plaintiff's Crohn's symptoms, she implored Plaintiff to remain smoke-free to keep her condition at bay.  (R. at 465, 469.)  Yet, Plaintiff failed to comply.  (R. at 26, 465, 496, 499, 616, 729.)  The ALJ may factor in noncompliance with medical advice when assessing Plaintiff's credibility as to the severity of her symptoms.  *Dunn*, 607 F. App'x. at 275-76.

Finally, Plaintiff's brief argument that the ALJ failed to consider her work history lacks merit.  While the ALJ did not mention Plaintiff's work history in the credibility determination, he considered her past work as a cashier and bus driver both during the hearing and in his written decision.  (R. at 20, 26, 44-45, 48-49, 57.)  Courts in the Fourth Circuit have confirmed that "the ALJ's mere failure to mention [a claimant's] work history explicitly does not warrant remand or reversal in the face of otherwise supported findings."  *Terrell v. Colvin*, 2015 WL 966256, at *13 (E.D. Va. Mar. 4, 2015); *see also Pope v. Colvin*, 2016 WL 1211807, at *12 (W.D. Va. Mar. 8, 2016), *report and recommendation adopted*, 2016 WL 1226972 (W.D. Va. Mar. 28, 2016) ("[E]ven though the ALJ did not explicitly address the correlation between [the claimant's] work history and her credibility, the ALJ was well aware of her work history, as he developed the evidence of such . . . during the hearing."); *Cooper v. Astrue,* 2011 WL 6742500, at *7 (E.D. Va. Nov. 8, 2011), *report and recommendation adopted,* 2011 WL 6749018 (E.D. Va. Dec. 22, 2011) (finding that work history alone does not contravene an ALJ's credibility finding where substantial objective medical evidence in the record does not support a plaintiff's subjective complaints).  Thus, when the ALJ appropriately considers all relevant factors, hears the

29

claimant's testimony and observes her demeanor, the ALJ's credibility determination deserves deference. *Shively*, 739 F.2d at 989. The ALJ here did just that.

In sum, Plaintiff's own statements, objective medical evidence, and Plaintiff's noncompliance contradict her subjective statements regarding the intensity and severity of her symptoms. The ALJ explained these discrepancies in his credibility determination, and substantial evidence supports that decision. Consequently, the ALJ's assessment of Plaintiff as "partially credible" does not warrant remand.

V.   CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: May 31, 2018

30